NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-724

DAVID P. BAILLARGEON & another[1]

vs.

MATHEW LENNON.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiffs, David P. and Lori A. Baillargeon, filed this Superior Court action alleging that their neighboring landowner, the defendant Mathew Lennon, had cut down or damaged trees, and had otherwise encroached, on the Baillargeons' land. After a jury trial at which the parties represented themselves, a judgment entered against Lennon in the principal amount of $310,000, consisting of $100,000 for damage to trees, trebled under G. L. c. 242, § 7 (treble damages for willful trespass to trees), plus $10,000 for the encroachments on land.

---

[1] Lori A. Baillargeon.

[2] We spell the defendant's name as it appears in the complaint, as is our custom.  The record elsewhere suggests that the defendant spells his first name "Matthew."

On appeal, and now well represented by counsel, Lennon argues that there was insufficient evidence to support the jury's special verdict findings (1) that it was he who trespassed against the trees and (2) that the trespass and other encroachments caused damages in the amounts found by the jury. Lennon acknowledges that he failed to preserve these arguments by moving for a directed verdict, but he asks us nevertheless to review his claims for "manifest injustice," or, put differently, to determine whether "the verdict is inconsistent with substantial justice" (quotation and citation omitted). Michnik-Zilberman v. Gordon's Liquor, Inc., 390 Mass. 6, 9-10 (1983). Having done so, and after also reviewing Lennon's claims concerning the jury instructions and various other issues, we affirm the judgment.

1. Evidence supporting verdict. a. Nature of appellate review. The nature of our review in this situation was explained in Hatton v. Meade, 23 Mass. App. Ct. 356, 361-362 (1987), which approvingly cites Michnik-Zilberman, 390 Mass. at 8-10:

> "[W]here a losing party has not moved for a directed verdict at the close of all the evidence, rule 50 (b)[3] not only precludes (a) the granting to that party of a motion for judgment n.o.v., but also (b) appellate review of the sufficiency of the evidence to support the verdict. . . . [Nevertheless,] a new trial may be granted where 'a jury's

---

[3] Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998).

2

verdict is wholly without legal support . . . in order to prevent a manifest injustice'" (citation and emphasis omitted).

We also draw guidance from Little v. Bankers Life & Cas. Co., 426 F.2d 509 (5th Cir. 1970), a decision that the Supreme Judicial Court cited with approval in Michnik-Zilberman, 390 Mass. at 10.  In Little, supra at 511, where the losing party at trial had not moved for a directed verdict, the United States Court of Appeals for the Fifth Circuit explained the scope of appellate review as follows:

> "[O]ur review of the sufficiency of the evidence . . . regarding the [key factual] issue is consequently foreclosed.  We may inquire whether there was any evidence supporting the submission of [that] issue and the jury's finding [in the opposing party's favor on that issue], but we may not question the sufficiency of whatever evidence we do find. . . .  Our consideration is limited to whether plain error has been committed which, if not noticed, would result in a manifest miscarriage of justice. . . .  No further may we delve."

As another Federal court has explained, absent proper preservation of a sufficiency claim, an appellate court examines only "whether the record reflects an absolute dearth of evidentiary support for the jury's verdict" (citation omitted). Zachar v. Lee, 363 F.3d 70, 74 (1st Cir. 2004).  See 9B C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2536, at 540 & n.9 (3d ed. 2008).

Here, accordingly, in evaluating Lennon's arguments that certain of the jury's findings were not based in the evidence,

3

we look not at the sufficiency of the evidence but only at "whether there was _any_ evidence supporting the submission of" that issue to the jury (emphasis added).  Little, 426 F.2d at 511.  "No further may we delve."  Id.

b.  Whether tree damage was caused by Lennon.  We turn first to the evidence that it was Lennon who cut or damaged the trees in question.  Mrs. Baillargeon testified that she saw a man hanging from a rope and trimming trees on the Baillargeons' property.  On cross-examination, Lennon showed her a photograph, inferably taken by him or while he owned his property, and which he later successfully introduced in evidence as exhibit no. 6. The photograph depicted, among other things, trees near the boundary between the parties' properties.  Mrs. Baillargeon again testified that she had seen someone "hanging from these trees . . . with a chainsaw" and "cutting branches."  This happened "earlier in the year."

Further, Lennon himself testified that he used a chainsaw and had "cut many piles of logs on [his] property."  Lennon also testified that he caused logs to be removed from his property that he did not believe were his but that had fallen on his house.  The foregoing, taken together, constituted some evidence that it was Lennon who cut or damaged the trees on the Baillargeons' property.  There was not an "absolute dearth of

4

evidentiary support for the jury's verdict" (citation omitted). Zachar, 363 F.3d at 74.

c. Monetary damages. We turn next to the evidence of whether monetary damages were appropriate. First, as for the cutting or damaging of trees, the Baillargeons' tree expert, Richard D'Agostino, testified that Mr. Baillargeon had shown him a list prepared by the Baillargeons of replacement values for the damaged trees. The expert testified that the values on the list totaled $109,000, and that these calculations were "reasonable" and "in the ballpark." This constituted some evidence of an appropriate amount of damages. Indeed, the figure endorsed by the expert was not much different from the $100,000 single-damages amount found by the jury.

Second, as for damages for the encroachments on the Baillargeons' land, the jury found that Lennon had "place[d] or maintain[ed]" two encroachments -- an "addition to [a] building" and a "[t]railer" -- and as a result awarded $10,000 in damages. Regarding the addition, the jury could see from a plan and photographs in evidence that the structure had a concrete block foundation, tall enough to allow for an exterior door leading to the space inside the foundation. The addition's upper level (inferably the living area) was accessible from another exterior door and had several windows. The jury could infer that it would cost the Baillargeons more than a nominal amount of money

5

to remove this addition and to restore the area to its previous condition.

As for the encroaching trailer, the evidence was only that it was "a big construction trailer that was left there . . . for months."  There was no evidence that it caused the Baillargeons any harm while it was present or that they had expended any money or time in having it removed (as opposed to Lennon's having removed it).  But neither does the record show whether the jury awarded any damages on account of the trailer.  Rather, the jury awarded encroachment damages of $10,000, unallocated to any particular encroachment.  The special verdict slip, to which Lennon had stated he had no objection, did not ask the jury to specify an amount of damages for each encroachment they found.  In light of all the foregoing, we cannot say there was no evidence that $10,000 could be an appropriate amount of encroachment damages.

2.  Jury instructions.  Lennon next argues that the jury instructions were deficient in that they did not explain the difference between direct and circumstantial evidence, what types of inferences from the evidence are reasonable (or unreasonable), and the prohibition against guesswork and speculation.  Lennon acknowledges that he did not object to the omission of these instructions at trial, but he again suggests that we should review for whether any error caused manifest

6

injustice.  See Rotkiewicz v. Sadowsky, 431 Mass. 748, 752 n.3 (2000) (noting in dictum that "[i]f the defendant had not preserved [his objection to the jury instructions], we would be limited to reviewing the claimed error only to prevent a manifest injustice").

Rotkiewicz sheds little light on how instructional error should be reviewed for manifest injustice.  As support for its suggestion that such review is available, Rotkiewicz cites Michnik-Zilberman, 390 Mass. at 9, which as we have seen concerned a waived claim that evidence was insufficient to support a jury verdict, and Cruz v. Commissioner of Pub. Welfare, 395 Mass. 107, 111 (1985), which concerned a Medicaid applicant's waived claim that an administrative agency failed to apply a Federal regulation under which she could be eligible for benefits.  See Rotkiewicz, 431 Mass. at 752 n.3.  Neither Michnik-Zilberman nor Cruz tells us how to assess whether assertedly erroneous jury instructions have led to a manifest injustice.  Indeed, Cruz, while it granted relief on a claim raised for the first time on appeal, did not use the phrase "manifest injustice" or any similar standard.[4]  See Cruz, supra at 111-112.

_____

[4] Instead, Cruz stated as follows:

"[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate

7

Nevertheless, this case differs from Cruz in at least three ways. First, while Cruz involved a pure error of law, Lennon has not shown any error here. Although jury instructions on the issues Lennon mentions are certainly desirable, and are regularly given, Lennon cites no authority establishing as a matter of law that they must be given, even absent any request by a party. Second, the error in Cruz was prejudicial, in the sense that it denied the plaintiff an opportunity to argue that she was eligible for benefits under a Federal regulation, and her argument had strong, albeit not conclusive, factual support. See Cruz, 395 Mass. at 112, 115. Here, in contrast, Lennon has not persuaded us that the omitted instructions, if given, had any particular probability of leading to a verdict significantly more favorable to him. Third, the error in Cruz required only a remand for additional agency proceedings, a result that the Supreme Judicial Court viewed as causing no particular prejudice to the agency. See id. at 111, 115-116. Here, in contrast, the only relief we could properly order for Lennon based on an instructional error would be a new trial, which would certainly

court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below. . . . Rules of practice and procedure are devised to promote the ends of justice, not to defeat them" (footnote omitted).

Cruz, 395 Mass. at 111, quoting Hormel v. Helvering, 312 U.S. 552, 557 (1941).

8

be burdensome and prejudicial to the Baillargeons, imposed on them through no fault of their own.  Accordingly, we conclude that, assuming arguendo that review of unpreserved claims of instructional error is available, the omission of the jury instructions identified by Lennon caused no manifest injustice.

3.  Other claimed errors.  a.  Closing argument.  Lennon argues that the Baillargeons' closing argument contained numerous prejudicial remarks that had no basis in the evidence and were intended to appeal to the jury's sympathies.  Having failed to object at trial, Lennon now argues that the judge should have acted sua sponte by interrupting the Baillargeons to instruct them to avoid such improper remarks.  Lennon points us to Commonwealth v. Olmande, 84 Mass. App. Ct. 231, 241 n.4 (2013) (Agnes, J., concurring), where a judge's responsibility to prevent improper argument was described as a "duty."

Lennon does not, however, point us to any decision ordering a new trial based on a judge's failure to take such action on her own motion, and we will not do so here.  Lennon's own closing argument contained numerous improper remarks, to such an extent that the judge found it necessary to instruct him to confine himself to the evidence.[5]  After he completed his

---

[5] It was within the judge's discretion, being in the best position to evaluate the content of the parties' improper arguments and their likely effect on the jury, to interrupt Lennon's argument but not that of the Baillargeons.

9

argument, the judge instructed the jury that, "with respect to either closing argument," they should disregard any statements not based on the evidence.  The judge's final instructions also told the jury that the closing arguments were not evidence, and that the jury should confine their deliberations to the evidence and not be swayed by sympathy or bias.  In these circumstances, even if we were to consider Lennon's unpreserved objection to the Baillargeons' closing argument, and to the judge's decision not to interrupt them to control their argument, he would not be entitled to relief.

b.  <u>Expert testimony</u>.  Lennon argues that the judge erred in denying his motion to exclude the testimony of the Baillargeons' tree expert, D'Agostino, based on the Baillargeons' failure to disclose D'Agostino's identity and the substance of his testimony until they filed their trial memorandum a few days before the 2025 trial.  Our review of the record, however, reveals that Lennon's motion, both as filed before trial and as argued at trial, was based on the belated disclosure only of D'Agostino's identity.  Lennon did not object to the belated or inadequate disclosure of the substance of D'Agostino's testimony.

In opposing the motion, the Baillargeons acknowledged that their pretrial memorandum had listed an expert other than

10

D'Agostino.[6] In response to the judge's question, however, they stated that they expected D'Agostino's testimony to be no different from what they had previously disclosed. Indeed, their 2024 pretrial memorandum and their 2025 trial memorandum used identical language to describe the substance of the testimony: "establishing replacement value of all of the trees that were cut down or intentionally damaged on the land of the [p]laintiffs by the [d]efendant." The judge therefore denied Lennon's motion, concluding that the expert's identity had changed but the substance of the expected testimony had not.

Lennon did not argue that the expert disclosure was insufficient. Nor did Lennon object when the expert testified that the damage calculations he had reviewed, and which he had already testified were "reasonable" and "in the ballpark," totaled $109,000. Thus, Lennon has waived any challenge to the substance of the expert's testimony, and we see no abuse of

---

[6] More accurately, the Baillargeons' 2024 pretrial memorandum listed four different arborists whom they had selected to testify about the replacement value of the trees at issue, but the memorandum asserted that each of the four had withdrawn due to threats and intimidation by Lennon.

discretion, let alone any manifest injustice, in the judge's decision to admit it.

Judgment affirmed.

By the Court (Vuono, Neyman &
  Sacks, JJ.[7]),

Clerk

Entered:  March 3, 2026.

---

[7] The panelists are listed in order of seniority.